# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

| | |
|---|---|
| **BRYAN BEAVERS**<br>and<br>**WENDY BEAVERS,**<br>    *On behalf of themselves individually and*<br>    *on behalf of a Class of similarly situated*<br>    *persons.*<br><br>    Plaintiffs,<br><br>**v.**<br><br>**SUMMIT COMMUNITY BANK, INC.,**<br>**310 N. Main Street**<br>**Moorefield, WV 26836**<br><br><u>**SERVE ON:**</u><br>**Dennis Snyder, Registered Agent**<br>**224 S. Main Street**<br>**Harrisonburg, VA 22801**<br><br>    Defendant. | Civil Action No. _____ |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Bryan Beavers and Wendy Beavers ("**the Beavers**") ("collectively "**Plaintiffs**" or "**Named Plaintiffs**"), on their individual behalf and on behalf of a class of similarly situated individuals defined *infra*, by their attorneys, Dale W. Pittman and the Law Office of Dale W. Pittman, P.C. and Phillip R. Robinson and the Consumer Law Center LLC (*pro hoc vice* admission pending pursuant to Local Rule 6(d)) and pursuant to Fed.R.Civ.P. 23 (Class Actions), sue Summit Community Bank, Inc. ("Summit" or "Defendant").  The Plaintiffs, on behalf of themselves and

the class members, demand a trial by Jury on all counts for which a right to trial by jury is allowed and, in support of their Class Action Complaint, state:

**INTRODUCTION**

1.      In these instances, such as the underlying matters involving Summit, the mortgage servicer places its interest and pattern of unsafe and unsound mortgage service practices above the remedial rights of homeowners and consumers.   Moreover, Summit unfairly and deceptively ignores its statutory and contractual duties including those which were agreed to as part of its duty to act safely and soundly.

2.      These practices are compounded when homeowners, like the Beavers, and the putative class members, try in good faith to resolve their situation and Summit disregards its duty to conduct a reasonable investigation of their notices of error and makes material misstatements of law in reply which confirm the underlying claim in this matter—i.e. that Summit as a pattern and practice violates its remedial, statutory duty pursuant to Real Estate Settlement Procedures Act, 12 U.S.C.A. § 2605(e)(3)("RESPA") which states:

> During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).

*Id.*

3.      Under authority granted to it pursuant to Dodd-Frank legislation, the Consumer Financial Protection Bureau ("CFPB") has further imposed this duty on Summit and other services in 12 C.F.R. § 1024.35(i)(1)("After receipt of a notice of error, a servicer may not, for 60 days, furnish adverse information to any consumer reporting agency regarding any payment that is the subject of the notice of error").   However, as shown below, Summit has also failed its mandatory

duty to "comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter" which includes 12 C.F.R. § 1024.35(i)(1).   12 U.S.C.A. § 2605(k)(1)(E).

4.      There is no question that RESPA was intended and is considered remedial legislation. *See e.g. Marais v. Chase Home Fin. LLC*, 736 F.3d 711, 719 (6th Cir. 2013)("As a remedial statute, RESPA is construed broadly to effectuate its purposes"); *Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-66 (9th Cir. 2012)("RESPA's provisions relating to loan servicing procedures should be 'construed liberally' to serve the statute's remedial purpose").  *See also* DODD–FRANK WALL STREET REFORM AND CONSUMER PROTECTION ACT, PL 111-203, July 21, 2010, 124 Stat 1376.  Dodd-Frank was specifically enacted to "improv[e] accountability and transparency in the financial system…[and] to protect consumers from abusive financial services practices." *Id.*

5.      Yet, as a matter of apparent standard policy and practice, Summit disregards the express requirements in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) to cease furnishing or providing adverse information to any consumer reporting agency regarding any payments or sums demanded due that are subject of the Qualified Written Requests/Notices of Error ("QWR/NOE") received from the Plaintiffs and Class members for a period of sixty days. It simply continues to furnish the disputed, adverse reporting with knowing and reckless disregard to the rights of the Plaintiffs and other Class members.

6.      The Beavers sent a QWR/NOE notice of error, dated May 6, 2020, to Summit by certified mail return receipt requested. The signed green card was never returned to Plaintiffs and the USPS website showed the letter as being "in transit." However, the letter has not been returned to the Plaintiffs as undeliverable and is presumed to having been delivered.

7.    In response to the Beavers' second QWR/NOE notice of error, dated July 13, 2020, to Summit, that Summit received on July 17, 2020, and was signed for by Don Rohrbaugh, Summit, as part of its consistent policy, practice and pattern:

    a.   Did not correct its errors related to Beavers' mortgage account and continued to claim they owed it sums which they did not owe; and

    b.   Did not suppress the negative credit reporting information that was in dispute as it was required to do so 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

8.    Summit has never responded to either of the Beavers' QWR/NOEs, which appears to be a consistent policy, practice, and pattern on Summit's part.

    a.   There has been no acknowledgement by Summit to the Beavers whatsoever as required by RESPA and its regulations, and

    b.   Summit has also failed to suppress all negative reporting for the period of the Beaver's dispute and thereafter Summit's receipt of their QWR/NOEs.

9.    It is plain legal error for Summit to disregard its duties under RESPA, i.e. 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

10.   Further, 12 U.S.C.A. § 2605(e)(3) was first added to RESPA by Congress as part of the CRANSTON–GONZALEZ NATIONAL AFFORDABLE HOUSING ACT, PL 101–625, November 28, 1990, 104 Stat 4079 which is more recent than Congress' enactment of the FCRA in 1968 in UNITED STATES STATUTES AT LARGE, PL 90-321, May 29, 1968, 82 Stat. 146.

11.   12 C.F.R. § 1024.35(i)(1) was promulgated by the CFPB in a Final Rule that became effective on January 10, 2014.  *See* Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 FR 10696-01.  In issuing its Final Rule the CFPB explained:

Industry commenters strongly objected to the 60-day reporting prohibition. Commenters said the proposal undermines the accuracy and integrity of credit reports. One commenter said the Fair Credit Reporting Act already governs credit reporting. One large bank commenter asserted that because credit reporting is a safety and soundness protection, banks have a duty to accurately report delinquencies. Several industry commenters also noted a concern that, based on prior experience, borrowers may use the reporting prohibition to manipulate the system by disputing legitimate delinquencies in order to apply for credit without derogatory marks on credit reports. The Bureau acknowledges the concerns expressed but notes that Congress specifically imposed the 60-day reporting prohibition with respect to qualified written requests in section 6(e) of RESPA. As discussed above, **the Bureau believes it is necessary to achieve the consumer protection purposes of RESPA, including to ensure responsiveness to borrower requests and complaints and the provision of accurate and relevant information to borrowers, to apply the same procedures to all notices of error as applicable to qualified written requests.** Otherwise, borrowers and servicers must expend wasteful resources parsing the form requirements applicable to qualified written requests and navigating between two separate regulatory regimes. As detailed above, the Bureau believes that the interests of borrowers and servicers are best served and the purposes of RESPA are best met through a single regulatory regime applicable to both qualified written requests and other notices of error. The Bureau is therefore adopting § 1024.35(i)(1) as proposed, as it is consistent with the 60-day reporting prohibition for qualified written requests required by section 6(e) of RESPA.

*Id.* at 10752 *(emphasis added).*

12.     As a direct and proximate result of Summit's violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Plaintiffs and the class members have been proximately harmed by Summit's publishing of derogatory information to the credit reporting agencies subject to disputes regarding the borrowers' payments and sums claimed due.  It was not permitted as a matter of law to report such information but did so anyway in disregard of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) and these damages put the Plaintiffs and others in a similar position in a negative, false light with their other creditors and the credit reporting agencies by the information reported by Summit that it was barred from reporting.  In addition, these damages include statutory damages available pursuant to 12 U.S.C.A. § 2605(f).

## JURISDICTION AND VENUE

13.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 since certain of the claims asserted herein arise under the laws of the United States.

14.     The Court has declaratory judgment authority pursuant to 28 U.S.C. § 2201, Fed.R.Civ.P. 57, CTS & JUD. PROC. § 3-409, and Fed.R.Civ.P. 23(c)(4).

15.     Venue is proper in this Court as the acts and conduct alleged all occurred in the Western District of Virginia.

## PARTIES

16.      Plaintiffs Bryan Beavers and Wendy Beavers ("**the Beavers**") are natural persons who own and reside at 302 Crabapple Street, Bluefield, Virginia 24605 ("**Beavers Property**"). The Beavers have resided at the Beavers Property at all times relevant and material to this action as their personal residence.

17.     Defendant Summit is regulated by the Federal Deposit Insurance Corporation. Summit qualifies as a mortgage servicer pursuant to 12 C.F.R. § 1024.2 since it holds and is responsible for the servicing of the Beavers' federally related mortgage loan (as that term is defined by 12 U.S.C.A. § 2602(1)).  In relation to the Plaintiff's loan, Summit collects and services the loan on behalf of Fannie Mae.

## FACTUAL ALLEGATIONS

### *General Allegations About Summit's Legal Knowledge*

18.     All persons, including licensed mortgage lender/servicers in the Commonwealth of Virginia, like Summit, are expected to know the law.

19.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(C)(E), Summit has a duty to the Plaintiffs and Class members to (i) take appropriate steps to avoid foreclosure as part of its standard

servicer's duties and (ii) comply with any other obligation(s) found by the CFPB, by regulation, to be appropriate to carry out the consumer protection purposes of 12 U.S.C.A. § 2605.

20.   Pursuant to 12 C.F.R. § 1024.38(b)(1)(i), Summit is required to "[p]rovide accurate and timely disclosures to a borrower as required by [12 C.F.R. § 1024.38] or other applicable law." Pursuant to 12 C.F.R. § 1024.35(b)(5), Summit is not permitted to "impos[e]… a fee or charge that the servicer lacks a reasonable basis to impose upon the borrower."  It is unreasonable and a violation of its duties for Summit to demand payments and sums, fees and charges from borrowers that it is prohibited from imposing in the first instance by contract and by law.

21.   Summit's knowledge is also represented by the standard and uniform Deeds of Trust securing its interest in the Beavers Property and properties of the putative class members. Each of those standard deeds of trust or mortgage incorporate as material terms of their agreements RESPA and its implementing regulations and other applicable laws.

### *Factual Allegations About the Credit Reporting System*

22.    In July 2019 the CFPB issued a report, *Building a Bridge to Credit Visibility*, which explained disputed credit reporting can have material impact on vulnerable consumers.

> The ability to access credit is a critical component for families and individuals nationwide to have the opportunity to climb the economic ladder, exercise informed consumer choice, build wealth, and achieve economic stability. During this panel, a panelist representing UnidosUS, a Latino nonprofit organization, explained that access to credit can affect consumers' daily lives in many ways, and often means the difference between economic opportunity and fragility. According to this panelist, access to credit affects where consumers reside, work, and go to school; it may also have lasting generational effects.

*Id.* at Page 7.

23.   Previously the Board of Governors of the Federal Reserve System's 2007 "Report to Congress on Credit Scoring and Its Effects on the Availability and Affordability of Credit" explained:

Inaccurate data may cause some consumers to pay more, or less, for credit than is warranted by their true circumstances. For the full benefits of the credit-reporting system to be realized, credit records must be reasonably complete and accurate. Yet, under the country's voluntary system of credit reporting, complete information is not always reported to the credit-reporting system. Moreover, data accuracy is an issue under any credit-reporting system. The accuracy of the data affects both credit scoring and judgmental evaluations because both techniques rely on the quality of the information included in credit reports. Judgmental underwriting, which requires a loan officer's individual attention to an application, provides an opportunity to identify inaccuracies that credit scoring does not.

*Id.* at Page 17.

24.    To help address and avoid the specific, negative consequences of continued, negative reporting by mortgage servicers (similar to those described in the preceding paragraphs) that are subject to borrower QWR/NOEs, Congress and the CFPB enacted a specific tool in the toolbox of rights and remedies in favor of borrowers—i.e. 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).  In plain language the CFPB explains the protection to the Plaintiffs and Class members as follows on its website:

Q. Can my mortgage servicer report negative information about me to a credit-reporting agency after I have sent an error dispute or information request?

A.  It depends. If your notice of error is in regards to a payment, your servicer can't provide negative information about that payment to any consumer reporting agency or credit bureau for the 60 days after it receives your notice of error.

https://www.consumerfinance.gov/ask-cfpb/can-my-mortgage-servicer-report-negative-information-about-me-to-a-credit-reporting-agency-after-i-have-sent-an-error-dispute-or-information-request-en-209/ (last visited October 4, 2021).

### *Factual Allegations Relevant to Plaintiffs Bryan and Wendy Beavers*

25.    On or about August 19, 2005, the Beavers acquired the Beavers Property, by Deed recorded in the land records for Tazewell County (Book 949, Page 0331).

26.     On January 18, 2012, Plaintiffs borrowed the sum of $98,700.00 from First Century Bank, N.A. in the form of a Simple Interest Fixed Rate Promissory Note ("Beavers Loan") for the purposes of refinancing their prior loan.  The Beavers' loan terms provided for 180 monthly principal and interest payments followed by a single, final principal and interest payment.  The total 180 monthly payments mean the Beavers Loan had a term of just 15 years.  No modifications of the Beavers Loan were ever agreed to by the parties to the Beavers Loan.

27.     The Beavers Loan was utilized by the Beavers exclusively for personal purposes to refinance the prior loan on the Beavers Property, pay other consumer debts and other consumer purposes.

28.     First Century Bank, N.A. would later merge with Summit Community Bank on April 1, 2017, and then rebrand to become Summit Community Bank.  Summit Community Bank then became the servicer of the Beavers Loan on behalf of Fannie Mae.

29.     The Beavers made all the payments (and more) required of them pursuant to the terms of the Beavers Loan.  However, Summit has falsely claimed to the Beavers that they owed it various sums of money which they disputed and it threatened them with foreclosure and other debt collection activities even though the Beavers had made all required payments and are current on the Beavers Loan.

30.     Summit threatened the Beavers that they owed sums to it related to the Beavers Loan, and it continued reporting to the credit reporting agencies that they owed various sums of money not owed and were otherwise past due on those sums which negatively impacted their credit scores and cast them in a negative light in the community and with the credit reporting agencies.

31.     Because of the continued disputes and reporting that they allegedly owed sums on the Mortgage Loan that were not owned, the Beavers sent Summit their written May 6, 2020

QWR/NOE to the address it published to them.  In this correspondence they specifically informed Summit that disputing the erroneous increase in the payment alleged to be due from the Beavers based upon Summit's escrow accounting of the loan.

32.     Because Summit failed to acknowledge or respond to their May 6, 2020 QWR/NOE and continued to demand payments not owed, the Beavers sent Summit their second written QWR/NOE on July 13, 2020, to the address it published to them.  In this correspondence they specifically informed Summit that: (i) it failed to respond to their May 6, 2020 QWR/NOE; and (ii) they again specifically informed Summit that they were disputing the erroneous increase in the payment alleged to be due from the Beavers based upon Summit's escrow accounting of the loan.

33.     In fact the Beavers owed nothing past due to Summit since they had paid all sums actually due on the Beavers Loan during the loan period and did not owe erroneous escrow sums claimed by Summit.

34.     In violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.35, Summit did not perform a reasonable investigation into either the May 6, 2020 QWR/NOE or the July 13, 2020 QWR/NOE.  This conclusion is based upon the following: (i) Summit never acknowledged receipt to the Beavers of the QWR/NOEs as required by RESPA and Regulation X; (ii) Summit never responded to the Beavers of the QWR/NOEs as required by RESPA and Regulation X; (iii) Summit never suppressed the disputed credit information reported by it to the credit reporting agencies upon receipt of the QWR/NOEs for a period of no less than 60 days as required by RESPA and Regulation X; and (iv) Summit never corrected its errors which infected the accounting of the Beavers' Loan and has continued to demand sums not actually owed and is threatening to foreclose on the Beavers and their property based on its fictional default.

35.     As way of additional example, in violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Summit furnished adverse information to the credit reporting agency known as TransUnion LLC regarding payments subject to the Beavers' July 13, 2020 QWR/NOE (including that any sums were even past due).  It furnished this adverse information related to Plaintiff Wendy Beavers on or about August 7, 2020 and September 7, 2020 (which were within sixty days of Summit's receipt of Beavers' second QWR/NOE).

36.     As way of additional example, in violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Summit furnished adverse and disputed information to the credit reporting agency known as Equifax Information Services, LLC regarding payments subject to the Beavers' May 6, 2020 QWR/NOE (including that accurate monthly, payment amount).  It furnished this adverse information related to Plaintiff Wendy Beavers on or about June 7, 2020  (which were within sixty days of Summit's presumed receipt of the Beavers' May 6, 2020 QWR/NOE). In response to the Beavers' July 13, 2020 QWR/NOE, Summit also never corrected its erroneous report of June 7, 2020 to Equifax whatsoever in relation to the information reported by it concerning Plaintiff Wendy Beavers.

37.     As way of additional example, in violation of its mandatory duty pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Summit furnished adverse and disputed information to the credit reporting agency known as Experian Information Services Inc. regarding payments subject to the Beavers' July 13, 2020 QWR/NOE (including that accurate monthly, payment amount).  It furnished this adverse information related to Plaintiff Wendy Beavers on or in July 2020  (within sixty days of Summit's presumed receipt of the Beavers' July 13, 2020 QWR/NOE). In response to the Beavers' July 13, 2020 QWR/NOE, Summit never requested Experian suppress the negative information reported by it in either August or September 2020.

38.     Summit's pattern and practice of violating its duties related to credit reporting concerning Plaintiff Wendy Beavers, as described in ¶¶ 35-37 *supra*, was repeated by it in relation to Plaintiff Bryan Beavers.

39.     The Beavers have been harmed as a result of Summit's acts and omissions described herein and that harm includes economic and non-economic damages in the form of emotional distress damages manifested by anger, frustration, fear, mental distress, anxiety, and worry.  The Beavers are also entitled to certain statutory damages under the claims asserted herein in light of Summit's pattern and practice of violating RESPA and Regulation X as shown herein.

### CLASS ALLEGATIONS

40.     The Named Plaintiffs bring certain claims, *infra*, on behalf of a class of similarly situated persons related to Defendant Summit under Fed.R.Civ.P. 23 ("**Summit Class**").  The Plaintiffs propose, as the definition of the Summit Class, that it be defined as follows (and subject to modification as this matter proceeds and as appropriate):

> All residential loan borrowers for whom Summit received a QWR/NOE in the three years immediately preceding this Class Action pursuant to 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.  Excluded from the class are any borrowers who obtained a discharge under Chapter 7 of the Bankruptcy Code after the date Summit received their QWR/NOE.

41.     Bryan Beavers and Wendy Beavers are the Named Plaintiffs for the Summit Class and qualify as members of the Summit Class.

42.     The Named Plaintiffs bring certain of their Summit Class claims solely upon the basis of Fed.R.Civ.P. 23(c)(4) to determine certain issues on a class-wide basis including:

        a.      The issue of Summit's liability for actual damages to the Summit Class members under RESPA (to which they can proceed and pursue in separate individual actions).

43.     The particular members of the Summit Class are capable of being described without difficult managerial or administrative problems.  The members of the Summit Class are also

readily identifiable from the information and records in the possession or control of the Defendant or its affiliates and agents and from public records.  Summit is required to maintain this information for the entire class period.  *See e.g.* 12 C.F.R. § 1024.38.

44.     The Summit Class members are sufficiently numerous, exceeding more than fifty persons, that individual joinder of all members is impractical.  This allegation is based on a data search of public records which identify that public complaints have been filed against Summit and it services thousands of residential, mortgage loans throughout the United States and as a matter of public records in the Commonwealth of Virginia alone, Summit has an interest in more than fifty consumer, mortgage loans, including as a Fannie Mae authorized servicer, during the class period in which borrowers would be most entitled and likely to utilize their rights pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

45.     There are questions of law and fact common to the Summit Class which predominate over any questions affecting only individual members of the Summit Class and, in fact, the wrongs alleged against the Defendant by the Summit Class members and the remedies sought by Named Plaintiffs against the Defendant are identical.

46.      These common questions of law are fact for the Summit Class members include but are not limited to:

    a.     whether Summit has a legal duty to request the consumer reporting agencies suppress derogatory credit reporting information about the Named Plaintiffs and Summit Class members pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1);

    b.     whether Summit has a duty to furnish any information about the Named Plaintiffs and Summit Class members to the credit reporting agencies;

c.      whether Summit's policy, practice, and procedure governing the suppression of disputed credit information in relation to the Named Plaintiffs' and the Summit Class members' QWR/NOEs complies with its statutory duties (that are also incorporated into the contracts between it and the Plaintiffs and Summit Class members) stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1); and

d.      whether Summit's conduct fits a pattern and practice of 12 U.S.C.A. § 2605 violations (including violations of RESPA's implementing regulations).

47.     Summit's defenses (which defenses are denied) would be typical or identical for each of the member of the Summit Class and will be based on the same legal and factual theories.

48.     Certification of the Summit Class under Fed.R.Civ.P. 23 is appropriate as to the members of the Summit Class in that common questions predominate over any individual questions and a class action is superior for the fair and efficient adjudication of this controversy.

49.     A class action will cause an orderly and expeditious administration of claims by the members of the Summit Class and economies of time, effort and expenses will be fostered and uniformity of decisions will be insured.

50.     The only individual questions concern the identification of members of the Summit Class.  This information can be determined by a ministerial examination of public records or from the Defendant's business records or other sources, which are admissible as an exception to the hearsay rule and as a statement by a party.  Named Plaintiffs do propose pursuant to Fed.R.Civ.P. 23(c)(4) for the Court to determine Summit's liability for actual damages to the Summit Class members so class members may pursue those individual damages in separate actions as necessary or appropriate based on their individual circumstances.

51.     The Named Plaintiffs' claims are typical of the claims of the Summit Class members pursuant to Fed.R.Civ.P. 23 since they are based on and arise out of identical facts constituting the wrongful conduct of the Defendant.

52.     The Beavers will also fairly and adequately represent and protect the interests of the Summit Class.  They are similarly situated with, and have suffered similar injuries as, the Summit Class members they seek to represent. They have also retained counsel experienced in consumer class actions, including actions involving unlawful collection and mortgage servicing practices.  The Beavers do not have any interests which might cause them not to vigorously prosecute this action or are otherwise adverse to the interests of the members of the Summit Class. Both feel they and the Summit Class members have been wronged, wish to obtain redress of the wrong, and want Defendant stopped from failing to comply with its mandatory duties stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1).

53.     The Summit Class members have suffered actual damages, losses, and harm similar those sustained by the Beavers described above.  The Beavers do seek an award of statutory damages on behalf of the Summit Class, as well as their own individual, actual damages under the claims asserted herein.  The Beavers also seek a determination of liability in favor of the Summit Class members as to their individual, actual damages, which can be pursued by the Summit Class members on an individual basis in separate actions.

54.     The concentration of the litigation concerning this matter in this Court is desirable.

55.     A failure of justice will result from the absence of a class action.

**COUNT I: VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.41
(On behalf of the Named Plaintiffs Individually and
on behalf of the Summit Class)**

56.      The Named Plaintiffs adopt by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.

57.      The Named Plaintiffs and Summit Class members are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41.

58.      Summit is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 and 12 C.F.R. § 1024.41 in relation to the Named Plaintiffs and Summit Class members.

59.      Pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1), Summit has legal duties to cease furnishing or providing adverse information to any consumer reporting agency regarding any payments that are subject to QWR/NOEs from the Named Plaintiffs and Summit Class members that it has received.

60.      The Named Plaintiffs and the Summit Class members each sent Summit QWR/NOEs concerning disputed payments and sums claimed due by Summit.

61.      Summit received those written QWR/NOEs at the addresses it published for such correspondence.

62.      In contravention of its mandatory duties pursuant to 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) and as part of its pattern, practice, and custom during the three years preceding the commencement of this action, Summit did not suppress its credit reporting to the credit reporting agencies, including Experian, Equifax, and TransUnion, related to the period of times disputed by the Named Plaintiffs' and the Summit Class members' QWR/NOEs.

63.     Summit has a contractual relationship with Experian, Equifax, and TransUnion and has the means and ability to suppress the negative or derogatory information subject to QWR/NOEs as required by RESPA and Regulation X.  Yet, it did not do so in relation to the Named Plaintiffs and putative class members.

64.     Upon information and belief, based upon the experiences of the Named Plaintiffs and the following facts and allegations, Summit has a pattern and practice of noncompliance with the requirements of 12 U.S.C.A. § 2605 and its implementing regulations for borrowers like the Named Plaintiffs and Summit Class members.

65.     Each of the Named Plaintiffs and each Summit Class member suffered nominal damages of no less than $5.00 to take the time and expense to send their QWR/NOE to Summit which entitled them to certain rights—including those stated in 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1)—which amount to actual damages since as part of Summit's custom, practice, and policy it never seeks to suppress and negative, derogatory reporting to the credit reporting agencies when it receives a QWR/NOE.

**Count II:  VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT
("RESPA"), 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.41
(On behalf of the Named Plaintiffs Individually)**

66.     The Named Plaintiffs adopt by reference the factual allegations contained in the preceding paragraphs of this Complaint with the same effect as if herein fully set forth.  This claim is brought on behalf of the Plaintiffs individually.

67.     The Beavers are "borrowers" entitled to the protections codified at 12 U.S.C.A. § 2605 and Regulation X.

68.     Summit is a mortgage servicer subject to the mandatory requirements of 12 U.S.C.A. § 2605 and Regulation X in relation to the Beavers.

69.     Pursuant to 12 U.S.C.A. § 2605(k)(1)(E), Summit had a legal duty to timely "to comply with any other obligation found by the Bureau of Consumer Financial Protection, by regulation, to be appropriate to carry out the consumer protection purposes of this chapter."

70.     Summit had duty of care under 12 U.S.C.A. § 2605, 12 C.F.R. § 1024.36, and 12 C.F.R. § 1024.35 to acknowledge in writing Plaintiff's QWR/NOEs within five days and to respond to the QWR/NOE after conducting a reasonable investigation in writing within 30 days (unless it seeks an extension of not more than 15 days).

71.     Summit did not acknowledge, respond, or investigate either of the Plaintiffs' QWR/NOEs.

72.     Summit also had duty of care under 12 C.F.R. § 1024.36 and 12 C.F.R. § 1024.35 to conduct a reasonable investigation of Plaintiffs' QWR/NOE since it failed to do any reasonable investigation as demonstrated *supra*.

73.     As a direct and proximate result of these violations Plaintiffs are entitled to their actual and statutory damages pursuant to 12 U.S.C.A. § 2605(f) described *supra* for Summit's failure to reasonably investigate their QWR/NOEs and correct its errors.

## PRAYER FOR RELIEF

I.      WHEREFORE, Named Plaintiffs and Summit Class members ask this Court to certify the Summit Class pursuant to Fed.R.Civ.P. 23 and appoint the Named Plaintiffs as class representatives and the undersigned counsel as Class Counsel;

II.     WHEREFORE, pursuant to the Claims asserted in Count I of this pleading, Named Plaintiffs and Summit Class members ask this Court to determine the issue of Summit's liability to the Summit Class members

for awards of actual damages for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(A) and Fed.R.Civ.P. 23(c)(4) to permit the Summit Class members to pursue their actual damages, if any, in separate actions but to determine liability in favor of the Named Plaintiffs individually and award individual, actual damages in this action to them in the sum of $20,000 to each Plaintiff;

III.   WHEREFORE, pursuant to the Claims asserted in Count I, Named Plaintiffs and Summit Class members also ask this Court to determine the issue of Summit's liability to the Named Plaintiffs and Summit Class members for an award of statutory damages available pursuant to awards of actual damages for its violations of 12 U.S.C.A. § 2605(e)(3) and 12 C.F.R. § 1024.35(i)(1) pursuant to 12 U.S.C.A. § 2605(f)(2)(B)(i) in the sum of $1,000,000 or the sum permitted based upon Summit's next worth under RESPA and Regulation X;

IV.   WHEREFORE, pursuant to the Claims asserted in Count I Named Plaintiffs and Summit Class members ask this Court to award to costs and attorney fees to them and their undersigned counsel pursuant to 12 U.S.C.A. § 2605(f)(3);

V.   WHEREFORE, pursuant to the Claims asserted in Count II, Plaintiffs also ask this Court, to find and declare that Summit is liable to the Plaintiffs individually for its failure to conduct a reasonable investigation of their QWR/NOEs required by 12 U.S.C.A. § 2605, 12 C.F.R. §

1024.36, and 12 C.F.R. § 1024.35 and award individual, actual damages in this action to them in the sum of $30,000 to each Plaintiff;

VI.     WHEREFORE, pursuant to the Claims asserted in Count II Plaintiffs also ask this Court to award costs and attorney fees to them and their undersigned counsel pursuant to 12 U.S.C.A. § 2605(f)(3);

VII.    WHEREFORE, Named Plaintiffs request the Court provide such other or further relief as the Court deems appropriate, including attorney fees and costs in relation to Count II of this Complaint.

Respectfully submitted,

/s/ Dale W. Pittman
Dale W. Pittman, VSB No. 15673
THE LAW OFFICE OF DALE W. PITTMAN, P.C.
112-A W. Tabb Street
Petersburg, VA 23803
(804) 861-6000
(804) 861-3368 fax
dale@pittmanlawoffice.com

Phillip R. Robinson
Pro Hoc Vice Admission Pending
Md. Bar No. 27824
Consumer Law Center LLC
10125 Colesville Road, Suite 378
Silver Spring, MD  20901
Phone (301) 448-1304
phillip@marylandconsumer.com

*Counsel for Plaintiffs*